UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

VARGHESE PHILIP,                    )
                                    )
        Plaintiff,                  )
                                    )    No. 1:09-CV-144
v.                                  )
                                    )    Collier/Lee
WRIGLEY MANUFACTURING               )
COMPANY, LLC,                       )
                                    )
        Defendant.                  )

# M E M O R A N D U M

Plaintiff Varghese Philip ("Plaintiff") brings this lawsuit against his former employer Wrigley Manufacturing Company, LLC ("Defendant"), alleging race and national origin discrimination, race and national origin harassment, and retaliation. Before the Court is Defendant's motion for summary judgment, which is supported by a memorandum (Court File Nos. 18, 19). Plaintiff filed a response (Court File No. 22), to which Defendant replied (Court File No. 29). Subsequently, Plaintiff filed a supplemental response (Court File No. 30), to which Defendant filed a reply (Court File No. 35). For the following reasons, the Court will **GRANT** Defendant's motion for summary judgment (Court File No. 18).


## I.      RELEVANT FACTS

Defendant is a corporation which produces confectionary goods, including products such as Juicy Fruit, Wrigley Spearmint, Life Savers, Crème Savers, Gummi Savers, and Altoids (Court File No. 18-2, ¶ 3). On February 15, 1995, Defendant hired Plaintiff as the HVAC Technician for its Chattanooga, Tennessee facility (Court File No. 1, ¶ 4). Plaintiff was the sole HVAC Technician at the Chattanooga plant (Court File No. 18-3, p. 43). As the HVAC Technician, Plaintiff was

responsible for maintaining all the HVAC, refrigeration, and air conditioning systems in the plant, diagnosing problems with these systems, and performing repairs (Court File No. 18-3, pp. 11-12). Plaintiff held this position until he was terminated on June 2, 2008 (Court File No. 1, ¶ 4). Plaintiff is an Indian man (Court File No. 18-4, p. 36).

Plaintiff's claims of discrimination, harassment, and retaliation arise from and relate to events during the final three years of his employment, from 2005 to 2008. The undisputed facts show that during this time period Plaintiff was subject to a number of disciplinary actions, Plaintiff made several complaints about various matters to supervisors, and Plaintiff was eventually suspended and then terminated. Relevant events from this time period include the following:

On February 10, 2005, Plaintiff received a verbal warning for violating Defendant's computer usage policy. The incident was described on a Corrective Action Form, which states an audit revealed Plaintiff had visited several websites unrelated to work (Court File No. 18-5, p. 2). Plaintiff apologized for the violation, and told his supervisors he would not use the computer in this manner anymore (Court File No. 18-3, p. 15).

On March 2, 2005, Plaintiff received another verbal warning for attendance violations. According to the Corrective Action Form, during the preceding seven months Plaintiff had begun a "trend" of being slightly late to work. The Form instructs Plaintiff to be at his work area at the start of his shift (Court File No. 18-3, p. 16; Court File No. 18-5, p. 3).

On Friday, January 6, 2006, an outside company, Mountain City, was brought in to hook up a communication cable between two buildings at Defendant's facility. Plaintiff was told by supervisors to work with Mountain City to ensure there were no issues. The installation process continued over the weekend. Once Mountain City finished running the cable between the two

buildings, one of Defendant's employees would need to be on hand to connect it to Defendant's computer. On Sunday, January 8, 2006, Plaintiff left work before the installation was completed. According to Plaintiff's deposition testimony, he told the Mountain City technicians to "call the maintenance guys" when they finished running the cable (Court File No. 18-3, pp. 19-20). The cable was not ultimately connected to Defendant's computer after Mountain City finished running it, and as a result Defendant had to shut down production for six hours because there was no communication between the chiller building and the plant (Court File No. 18-5, p. 4). Although Plaintiff was not disciplined for this incident, the incident report admonished him "[w]hen you work on something, you must complete the job or communicate to a Team Leader or coworker what still must be done to complete the job" (*id.*).

On November 8, 2007, Plaintiff received another verbal warning stemming from an incident in which a water leak destroyed 9,400 pounds of Defendant's product. On October 29, 2007, the Operations Supervisor at Defendant's plant notified maintenance that a system had experienced down time due to a jam caused by wet starch and deformed product. The source of the wetness was eventually traced to an overflowing 55 gallon container that had been placed above the conditioning tunnels. The container had been placed there by Plaintiff to catch water dripping from a leak. After placing the container, Plaintiff left on vacation. While he was gone, the container filled up, overflowed, and leaked water through the ceiling of the conditioning tunnel and into the product (Court File No. 18-5, p. 5). In his deposition, Plaintiff acknowledged the incident, but maintained he had informed others of the leak in the past, and during his absence someone else should have monitored the container and emptied it as needed (Court File No. 18-3, pp. 23-29). The Corrective Action Form cites Plaintiff for knowing about the leak for some time but not taking proper

corrective action to resolve it. It also states Plaintiff did not adequately communicate with supervisors about the problem, or request the resources needed to properly fix it (Court File No. 18-5, p. 5).

In 2006 and 2007, Plaintiff began reaching out to a number of executives of Defendant corporation about concerns he had with the way the Chattanooga plant was being run. On May 16, 2006, Plaintiff e-mailed Surindar Kumar, a "big shot at Wrigley" (Court File No. 22-1, p. 31; Court File No. 22-2, p. 16). Plaintiff believed Mr. Kumar was Indian (Court File No. 22-1, p. 31). In this e-mail, Plaintiff stated he would like to talk with Mr. Kumar about some "problems for lack of a better term" (Court File No. 22-2, p. 16). Eventually, Plaintiff connected with Mr. Kumar by phone, and in a short conversation told Mr. Kumar about concerns he had "about the equipment" at the Chattanooga plant, and the way things were being done in 2006, as compared with "the way that it was done before" (Court File No. 22-1, p. 33).

On November 20, 2007, Plaintiff e-mailed Brijash Malhotra, regional director of Defendant's Confection Division, stating he would like to speak with him at his convenience. Mr. Malhotra answered by e-mail, asking "What's the topic?" Plaintiff replied he wished to speak to Mr. Malhotra about "poor routine maintenance on equipments [sic] in this plants [sic] and other issues." Mr. Malhotra then responded that since Plaintiff had "already made [him] aware of these opinions twice in the past, we can only have a meaningful discussion if there is anything new." Mr. Malhotra closed the e-mail by encouraging Plaintiff to bring these issues up through his manager (Court File No. 22-2, p. 11). Mr. Malhotra is Indian (Court File No. 18-3, p. 34; Court File No. 22-1, p. 19).

On December 19, 2007, Plaintiff again e-mailed Mr. Malhotra. In addition to raising issues

about maintenance at the plant, Plaintiff also raised issues about his supervisor, Ray Spraker. Plaintiff stated he had successfully maintained all of the HVAC needs at the plant from 1995 to 2004, but "everything changed when Ray Spraker took over" in 2005 (Court File No. 22-2, p. 10; Court File No. 22-3, p. 2). Plaintiff claimed Mr. Spraker was not properly overseeing maintenance of the HVAC and refrigeration systems at the plant. Specifically, Plaintiff stated Mr. Spraker did not maintain a proper amount of propylene glycol in chilling systems, which was causing compressors to over heat and burn out. (Court File No. 22-2, p. 10). Plaintiff also claimed Mr. Spraker was wasting money, on one occasion paying a contracting company $11,000 to do a job which Plaintiff alleged he could have done for less than $400. Plaintiff claimed Mr. Spraker had never worked on HVAC units, and "does not know what to do."

In addition, Plaintiff described an incident where Mr. Spraker used inappropriate language with him. Mr. Spraker wanted Plaintiff to replace two pumps, but Plaintiff informed Mr. Spraker the problem was only with the strainers, not the entire pump apparatus. Mr. Spraker "didn't agree with that and began to say curse words to [Plaintiff]" (*id.*). Plaintiff informed Mr. Malhotra there were several other occasions in which Mr. Spraker used curse words. In his deposition, Plaintiff clarified Mr. Spraker used the "F word" approximately 10 times over the course of five years (Court File No. 18-3, pp. 6-7). Alton Holcomb, one of Plaintiff's co-workers, states he did not observe Mr. Spraker yell at other Caucasian or African-American employees in the same manner as he did Plaintiff (Court File No. 23, ¶ 2).[1]

After Plaintiff complained about Mr. Spraker's use of profanity, Damon Jackson, Senior Engineering Manager of the Chattanooga plant, met with Mr. Spraker and informed him that yelling

---

[1]The basis of this statement is unclear, as Mr. Holcomb retired in 2004.

or cursing in the workplace would not be tolerated (Court File No. 18-8, ¶ 4).

On January 15, 2008, Mr. Jackson, Mr. Malhotra, and Human Resources Manager Laura Burke met with Plaintiff to discuss his concerns and job performance. During that meeting, Mr. Jackson explained to Plaintiff that Plaintiff, as the sole HVAC Technician, was responsible for the maintenance issues he complained about. Mr. Jackson told Plaintiff he would provide whatever support was needed to resolve HVAC issues, but he could only do so if Plaintiff communicated his needs with Mr. Jackson. (Court File No. 18-8, ¶ 5). During the meeting, Plaintiff was told he would need to submit a written maintenance plan on the factory's HVAC systems, detailing what restorative and preventative maintenance activities needed to be done, and what additional resources Plaintiff needed to accomplish those activities (Court File No. 18-4, pp. 9-10). The plan would also need to explain how Plaintiff was going to communicate issues in a timely manner in the future, and list what things Plaintiff thought he needed to do differently (Court File No. 18-4, p. 10). Three days later, on January 18, 2008, Mr. Jackson sent Plaintiff a follow-up e-mail, reminding him of what details needed to be included in the maintenance plan (Court File No. 22-2, p. 17).

On March 27, 2008, Plaintiff received a performance evaluation rating of "More Expected" (Court File No. 18-3, pp. 36-38; Court File No. 18-5, pp. 9-10). Consequently, he was placed on a Performance Improvement Plan ("PIP") (Court File No. 22-2, p. 12). The PIP specified Plaintiff needed to, among other things, complete permanent repairs within seven days, communicate with supervisors if unable to complete an assignment, and prioritize work load to ensure tasks are completed in a timely manner (*id.*). The PIP also required Plaintiff to write a plan to implement the indicated improvements, and submit it within 14 days (*id.*). Plaintiff did write a plan, and submitted it 20 days later (Court File No. 22-2, pp. 13-14).

Plaintiff alleges over the next few months, Mr. Spraker tended to assign him difficult and dirty jobs, such as cleaning coils or moving air filters from location to location (Court File No. 22-1, pp. 39-45).

On April 4, 2008, Plaintiff received a written warning for failing to comply with the terms of the PIP, specifically for not communicating he was unable to complete a job within the time frame (Court File No. 22-2, p. 8). On April 2, 2008, the plant was shut down for a 48 hour cleaning process (*id.*). Towards the end of this period, Plaintiff was told by a supervisor to clean a particular coil (Court File No. 22-1, pp. 16-17). Plaintiff claims he told the supervisor he was busy with another important project that he needed to finish, but he would clean the coil as soon as he had time (Court File No. 22, p. 4; Court File No. 22-1, pp. 16-17). At the end of the 48 hour cleaning period, it was discovered Plaintiff had yet to clean the coil (Court File No. 22-2, p. 8). Plaintiff did clean the coil before he left for the day, but not before the start up of production had been delayed for an hour as a result (*id.*). The Corrective Action Form states Plaintiff violated performance expectations by failing to communicate closely with supervisors about his inability to clean the coil in timely fashion (*id.*).

On May 27, 2008, Plaintiff received a five day suspension for failing to comply with the terms of the PIP, specifically for failing to correct issues in a timely manner, and to communicate with supervisors about difficulties completing projects (Court File No. 22-2, p. 15). On the morning of May 27, 2008, several operators informed Mr. Jackson the plant temperature was high, adversely affecting production (Court File No. 18-8, ¶ 9). Upon investigation, it was discovered the high temperature was caused by clogged filters on a particular rooftop air conditioning unit (Court File No. 22-2, p. 15). The Corrective Action Form states the filters on this unit were completely plugged,

which indicated several months of neglect (*id.*). While on the roof, Mr. Jackson examined several other units and found they too had clogged filters (*id.*). He also discovered a unit making a loud noise due to a bad bearing (*id.*). The Form explains Plaintiff is being suspended for failing to complete routine maintenance on these air conditioning units, or to request additional support from his supervisors (*id.*). During Plaintiff's five day suspension, Mr. Jackson met with Mr. Malhotra, Ms. Burke, and Robert Wojcik, Director of Factory Operations, to discuss what action to take with Plaintiff (Court File No. 18-8, ¶ 11). They decided to terminate Plaintiff, effective June 2, 2008, for poor performance and failure to improve under the PIP (Court File No. 18-8, ¶ 11; Court File No. 1, ¶ 4).

Plaintiff alleges he was not, in fact, terminated for poor performance or failure to improve under the PIP, but rather on account of his Indian national origin and race. Furthermore, Plaintiff alleges the workplace environment during the last few years of his employment, including the job expectations placed on him, disciplinary actions against him, and Mr. Spraker's profanity, constitute harassment on account of his Indian national origin and race. Lastly, although Plaintiff does not plead retaliation in his complaint, in his deposition and response to Defendant's motion for summary judgment, Plaintiff alleges his termination was retaliatory, on account of his complaining about Mr. Spraker's profanity and maintenance problems at the plant.

## II.    STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The moving party bears

the burden of demonstrating no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The Court views the evidence, including all reasonable inferences, in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). However, the non-movant is not entitled to a trial based merely on its allegations; it must submit significant probative evidence to support its claims. *Celotex*, 477 U.S. at 324; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Should the non-movant fail to provide evidence to support an essential element of its case, the movant can meet its burden of demonstrating no genuine issue of material facts exists by pointing out such failure to the court. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

At summary judgment, the Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). If the Court concludes a fair-minded jury could not return a verdict in favor of the non-movant based on the record, the Court may enter summary judgment. *Id.* at 251-52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).


## III.    ANALYSIS

On the basis of the facts set out above, Plaintiff alleges he was unlawfully discriminated against on the basis of his race and national origin, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq*. ("Title VII"), 42 U.S.C. § 1981 ("§ 1981"), and the Tennessee Human Rights Act, T.C.A. §§ 4-21-301 *et seq*. ("THRA"). However, the precise nature of Plaintiff's additional claims are difficult to discern, as his complaint alleges discrimination and

*harassment*, but his response to Defendant's motion for summary judgment refers to the harassment claim as a *retaliation* claim, and cites the elements of a Title VII retaliation claim. The Court will construe Plaintiff's pleadings broadly, as stating claims for national origin and race discrimination, national origin and race harassment, and Title VII and THRA retaliation. Defendant contends Plaintiff has wholly failed to present any evidence he was discriminated against or harassed on account of being Indian, or was retaliated against for reporting the such discrimination or harassment. As explained below, the Court agrees with Defendant.

**A.      Race and National Origin Discrimination**

Plaintiff alleges race and national origin discrimination, in violation of Title VII, 18 U.S.C. § 1981, and the THRA. Discrimination claims brought under the THRA and § 1981 are evaluated under the same analytical framework and federal case law that applies to claims brought pursuant to Title VII. *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 464 (6th Cir. 2001). The Court will therefore analyze Plaintiff's state and federal discrimination claims simultaneously under the Title VII framework.

Claims for race or national origin discrimination under Title VII may be established in one of two ways. A plaintiff "may establish a prima facie case of discrimination either by presenting direct evidence of intentional discrimination by the defendant or by showing the existence of circumstantial evidence which creates an inference of discrimination." *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995) (citations omitted). "The direct evidence and circumstantial paths are mutually exclusive; the plaintiff can meet her burden with either method of proof." *Weberg v. Franks*, 229 F.3d 514, 522-23 (6th Cir. 2000). Either way, a "plaintiff's burden with respect to establishing a prima facie case is not onerous." *Jackson v. RKO Bottlers of Toledo, Inc.*,

743 F.2d 370, 377 (6th Cir. 1984) (citation omitted).

Viewing the evidence in the light most favorable to Plaintiff, he does not present any direct evidence he was discriminated against on account of his race or national origin. Plaintiff implicitly acknowledges this, as his response brief omits a direct evidence analysis and proceeds straight to the circumstantial evidence framework.

A circumstantial racial discrimination claim is evaluated using the familiar burden-shifting approach established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined by *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981). Under the *McDonnell Douglas* framework, the plaintiff carries the initial burden of establishing a *prima facie* case of discrimination. *Vaughn v. Watkins Motor Lines, Inc.*, 291 F.3d 900, 906 (6th Cir. 2002). To establish a prima facie case of race discrimination, the plaintiff must demonstrate (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was qualified for the job; and (4) his employer treated similarly situated employees outside the protected class more favorably, or his position was filled with a person outside of his protected class. *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006).

Once the plaintiff establishes a *prima facie* case of discrimination, the burden of production shifts to the defendant to provide a legitimate, nondiscriminatory reason for its employment actions. *Farmer v. Cleveland Public Power*, 295 F.3d 593, 603 (6th Cir. 2002). If the defendant produces such a nondiscriminatory reason, the burden then "returns to the plaintiff to demonstrate the defendant's proffered reason is pretextual." *Id.*; *see Burdine*, 450 U.S. at 253.

### 1.      Prima Facie Case

Plaintiff clearly satisfies the first two elements of the *prima facie* case. He is a naturalized

American citizen of Indian ancestry who came to the United States shortly before he started working at Defendant's plant in 1995. He also suffered an adverse employment action. Not every workplace inconvenience is an actionable Title VII adverse action. *See Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885 (6th Cir. 1996). Rather, an adverse employment action is one that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 767-78 (6th Cir. 2008) (quoting *Burlington Industries v. Ellerth*, 524 U.S. 742, 761 (1998)). Here, most of the workplace conduct Plaintiff complains of falls far short of Title VII adverse employment actions. Written warnings, poor plant management, undesirable assignments, and Mr. Spraker's biannual use of the "F word" do not constitute "significant changes" in Plaintiff's employment status. *See Lindsey*, 295 F. App'x at 767; *McMillian v. Potter*, 130 F. App'x 793, 797 (6th Cir. 2005) (finding a warning letter in lieu of suspension cannot meet the definition of an adverse employment action); *Kinamore v. EPB Elect. Util.*, 92 F. App'x 197, 202 (6th Cir. 2004) (finding supervisor's use of profanity was not an adverse employment action, because it did not affect plaintiff's "responsibilities, wages, title or benefits"); *see also Harper v. City of Jackson Mun. Sch. Dist.*, 149 F. App'x 295, 303 (5th Cir. 2005) ("undesirable work assignments are not adverse employment actions") (citation omitted). However, it is undisputed Plaintiff was ultimately terminated by Defendant. Termination is clearly an adverse employment action.

As to the third prong, "[a]t the prima facie stage, a court should focus on a plaintiff's *objective* qualifications to determine whether he or she is qualified for the relevant job." *Wexler v. White's Fine Furniture*, 317 F.3d 564, 575 (6th Cir. 2003). A plaintiff need only show his

qualifications "are at least equivalent to the minimum objective criteria required for employment in the relevant field." *Id.* at 576. In other words, a plaintiff need not show he was performing his job with aplomb, only that he possessed the "required general skills" to do his job. *Id.* Furthermore, when determining whether a plaintiff was qualified for his position, "a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff." *Quinn-Hunt v. Bennett Enters.*, 211 F. App'x 452, 457 (6th Cir. 2006) (citation omitted). Here, Plaintiff worked as the sole HVAC Technician at Defendant's Chattanooga plant from 1995 until 2008. Thus, although the parties dispute whether Plaintiff's performance was satisfactory during the last few years of his employment, there is little question Plaintiff possessed the required general skills for the position from which he was terminated in 2008.

The fourth prong requires a plaintiff to show his employer treated similarly situated employees outside the protected class more favorably, or filled his position with a person outside of his protected class. *Wright*, 455 F.3d at 707. In the present case, Defendant maintains there are no other "similarly situated employees" with whom Plaintiff's treatment can be compared, since he was the sole HVAC Technician at the Chattanooga plant. Thus, argues Defendant, Plaintiff cannot satisfy the fourth prong. However, Defendant neglects to consider the alternative way of satisfying the fourth prong: showing a discharged employee's position was filled by a person outside of his protected class. Plaintiff alleges he was replaced by a white male (Court File No. 22, p. 11). Plaintiff has also submitted the affidavit of co-worker Alton Holcomb, who states Plaintiff was replaced by a white male (Court File No. 23, ¶ 7). The basis of Mr. Holcomb's statement is unclear, since he retired from Defendant's plant in 2004 (Court File No. 23, ¶ 1). Hence, it is possible Mr. Holcomb's testimony on the topic would be inadmissible for lack of personal knowledge.

Nonetheless, Defendant has made no statements regarding Plaintiff's replacement, and has submitted no evidence to refute Plaintiff's allegation he was replaced by a white man. Because the Court must view all evidence in the light most favorable to the nonmoving party, Plaintiff's unchallenged allegation he was replaced by a white male is sufficient to satisfy the fourth prong, and thus sustain Plaintiff's *prima facie* case. *See Wright*, 455 F.3d at 707 (finding plaintiff's unchallenged assertion he was replaced by a white man sufficient to sustain a prima facie case of race discrimination).

### 2. Legitimate, nondiscriminatory reasons

Because Plaintiff has established a *prima facie* case, the burden of production shifts to Defendant to put forth a "legitimate, nondiscriminatory reason" for Plaintiff's termination. *Id.* at 706. Defendant has met this burden. Defendant has submitted substantial evidence indicating the reason for Plaintiff's termination was poor job performance. Corrective Action Forms describe a number of occasions where Plaintiff's alleged action or inaction caused substantial production delays, lost product, and other issues. Defendant's evidence also suggests Plaintiff failed to communicate adequately with his supervisors, despite numerous instructions to do so. These reasons are legitimate, nondiscriminatory ones "because they are reasons, supported by admissible evidence, which *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." *Id*.

### 3. Pretext

Because Defendant meets its burden of production in explaining its reasons for taking action against Plaintiff, Plaintiff must now present evidence these reasons are pretextual. "Pretext may be shown either directly by persuading the trier of fact that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is

unworthy of credence." *Id.* (citation omitted). A finding of pretext cannot be based upon simple refusal to believe the employer's explanation; there must be "a sufficient basis *in the evidence* for doing so." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994). Courts "do not require that the decisional process used by the employer be optimal . . . . Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Wright*, 455 F.3d at 708 (citation omitted).

Here, Plaintiff has failed to present any evidence, direct or indirect, that Defendant's stated reasons are pretextual. Plaintiff's primary argument for pretext seems essentially to be his belief he was performing his job satisfactorily, and he did not deserve the performance warnings and discipline he received. Plaintiff does not challenge the underlying facts which Defendant claims demonstrate Plaintiff's performance problems. He does not dispute placing the 55 gallon container under the leak before leaving on vacation, going home before the communication cable was hooked up, failing to clean the coil during the 48 hour shutdown, or that Mr. Jackson discovered clogged air conditioning filters which were causing the plant to overheat. Rather, even while acknowledging he was solely responsible for maintaining Defendant's HVAC systems, Plaintiff claims he did not rightfully bear the blame for these occurrences, either because other people should have prevented them, or because he was not given enough time to perform his work.

Plaintiff's contention he was performing his job as well as could reasonably be expected is an insufficient evidentiary basis for discrediting Defendant's proffered reasons for termination. For one thing, the record indicates Plaintiff was not disciplined simply for failing to get all of his work done, but for failing to adequately communicate with supervisors when he was unable to complete a task. Thus, even assuming *arguendo* Plaintiff has presented evidence he did not have enough time

to complete his assigned maintenance tasks, this would not show Defendant's stated reasons for termination were pretextual. Moreover, it may be true Defendant's business interests would be well served by better maintaining its HVAC systems or hiring additional HVAC Technicians, as Plaintiff at times suggested. However, the Court need not believe Defendant's business judgment or "decisional process" was optimal to avoid a finding of pretext, only that Defendant "made a reasonably informed and considered decision" before terminating Plaintiff. *Id*. Plaintiff has provided no actual evidence Defendant's work expectations and decision making were sufficiently suspect to support an inference of pretext. Plaintiff has only offered his subjective opinion that his work was good and his blame for HVAC issues undeserved. This opinion is not a "sufficient *basis in the evidence*" for finding pretext.[2] *Manzer*, 29 F.3d at 1083; *see also Giles v. Norman Noble, Inc.*, 88 F. App'x 890, 895 (6th Cir. 2004) ("Rumors, conclusory allegations and subjective beliefs . . . are wholly insufficient evidence to establish a claim of discrimination as a matter of law.") (citation omitted). Put simply, there is no non-speculative reason to think Plaintiff was terminated for any other reason than the poor performance cited by Defendant.

Because Plaintiff has not met his burden of proving pretext, the Court concludes a reasonable jury could not find Plaintiff was discriminated against on the basis of his race or national origin. Accordingly, Defendant is entitled to summary judgment on these claims.

---

[2]Additionally, Plaintiff's response brief asserts Defendant's stated reasons reveal themselves to be a pretextual cover for retaliation when one considers the fact Plaintiff had complained to Mr. Malhotra about problems at the Chattanooga plant. However, this argument, if believed, proves too much. Plaintiff complained to Mr. Malhotra about maintenance issues at the plant and Mr. Spraker's occasional use of the "F word;" Plaintiff never complained about racial discrimination or harassment. Thus, if the true reason for Plaintiff's termination was his complaints, he was *ipso facto* not terminated because of his race or national origin.

**B.      Race and National Origin Harassment**

Plaintiff alleges race and national origin harassment.  To establish a claim for race or national origin harassment pursuant to Title VII, a plaintiff must demonstrate (1) he is a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was based on race; (4) the harassment unreasonably interfered with his work performance by creating an intimidating, hostile, or offensive work environment; and (5) the employer is liable.  *See Barrett v. Whirlpool Corp.*, 556 F.3d 502, 515 (6th Cir. 2009).

The basis of Plaintiff's harassment claim is difficult to discern.  He does not specify any alleged harassment based on race, and his response brief appears to abandon the harassment claim.[3] Viewing the pleadings charitably, however, Plaintiff may plausibly be understood as claiming his work assignments, his discipline, and Mr. Spraker's occasional use of the "F word" constitute racial and national origin harassment.

Not all objectionable conduct rises to the level of actionable harassment.  It must be conduct "severe or pervasive enough to create an objectively hostile or abusive work environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993).  Title VII "does not create a general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 80 (1998); *see Anderson v. Memphis Bd. of Educ.*, 75 F. Supp. 2d 786, 793 (M.D. Tenn. 1999) ("The mere use of foul language, without more, does not automatically create an unreasonably abusive or offensive environment under Title VII.").  Additionally, it is well established "Title VII protects only against harassment based on race . . . or national origin.  It does not protect against general harassment,

_____

[3]As noted earlier, Plaintiff's response brief has a section heading which mentions harassment, but the body of that section proceeds to cite the elements for a retaliation claim.

regardless of how severe or pervasive it may be." *Scarborough v. Brown Group*, 972 F. Supp. 1112, 1122 (W.D. Tenn. 1997) (citation omitted). To establish that harassment is based on race or national origin, a "plaintiff must show that, but for his race, he would not have been the object of harassment." *Barnes v. UPS*, 366 F. Supp. 2d 612, 618 (W.D. Tenn. 2005).

Here, there is no evidence by which a trier of fact could conclude Plaintiff suffered harassment on account of his race or national origin.  The workplace conditions Plaintiff complains of, including moving air conditioning filters to several locations, receiving discipline several times in three years, and Mr. Spraker's use of the "F word" 10 times in five years, were neither "severe" nor "pervasive."  More importantly, even assuming these actions were severe and pervasive, and further assuming they constituted harassment rather than justified or at least adiaphorous behavior, Plaintiff has offered no evidence, other than the fact he happens to be Indian, to suggest he would not have suffered these workplace conditions "but for his race."[4]  *Id.*  Although the Court must view the evidence in the light most favorable to Plaintiff, Plaintiff "is not entitled to a trial based merely on [his] allegations; [he] must submit significant probative evidence to support [his] claims. *Celotex*, 477 U.S. at 324.  Because Plaintiff has failed to submit such evidence, Defendant is entitled to summary judgment on Plaintiff's race and national origin  harassment claims.

**C.      Retaliation**

Although Plaintiff's complaint does not clearly plead retaliation, Plaintiff's response brief to Defendant's motion for summary judgment discusses a Title VII retaliation claim, albeit under

_____

[4]When Plaintiff's own attorney asked him during deposition why he believed his allegedly differential treatment was specifically *on account of* his race or national origin, Plaintiff merely responded, "I don't know . . . because, you know, I don't know about that."  (Court File No. 22-1, p. 42).

a heading referencing harassment. Additionally, Plaintiff's deposition testimony indicates he believes he was retaliated against for complaining to higher authority about maintenance issues at the Chattanooga plant, as well as Mr. Spraker's use of profanity (Court File No. 18-3, pp. 5, 13; Court file No. 18-4, pp. 27-28, 35). The Court will therefore consider Plaintiff to be asserting retaliation claims pursuant to Title VII and the THRA. Since retaliation claims brought pursuant to the THRA are evaluated under the same analytical framework and federal case law as Title VII claims, the Court will analyze Plaintiff's state and federal retaliation claims simultaneously under the Title VII framework.[5] *See Wade*, 259 F.3d at 464.

To make out a *prima facie* case of retaliation, a plaintiff must demonstrate: "(1) []he engaged in activity protected by Title VII; (2) the defendant knew of [his] exercise of her protected rights; (3) the defendant subsequently took an adverse employment action against the plaintiff or subjected the plaintiff to severe or pervasive retaliatory harassment; and (4) there was a causal connection between the plaintiff's protected activity and the adverse employment action." *Barrett*, 556 F.3d at 516. Activity "protected" by Title VII is not simply any activity against which an employer might possibly wish to retaliate. Rather, "protected activity" is activity directed against the specific evils made unlawful by Title VII, such as race and national origin discrimination. *See* 42 U.S.C. § 2000e-3 ("It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has . . . participated in any manner in an investigation . . . under this

---

[5]Following *Gossett v. Tractor Supply Co., Inc.*, 2010 WL 3633459 (Tenn. Sept. 20, 2010), Tennessee *common law* retaliation claims are no longer analyzed under the same analytic framework as Title VII and THRA retaliation claims. Plaintiff does not assert common law retaliation in this case. However, even if the Court applied *Gossett* in the present case, the outcome would not be affected since Plaintiff fails to make out even a *prima facie* case of retaliation.

subchapter."); *Barrett*, 556 F.3d at 520 ("With respect to 'protected activity,' the anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings . . . and those who oppose discrimination made unlawful by Title VII.") (citation omitted).

In his response brief, Plaintiff claims the only disputed issue in his *prima facie* case for retaliation is whether there is a causal link between his protected activity and the adverse action of his employer. However, this position skirts the issue of whether Plaintiff's complaints to higher authorities in fact constituted protected activities. Only complaints concerning "discrimination made unlawful by Title VII" come under the protection of Title VII's anti-retaliation provision. *Id.* Complaints about the way a business is being run, or even "complaints concerning unfair treatment in general" are insufficient to constitute protected activity if they do not "specifically address discrimination." *Weaver v. Ohio State Univ.*, 71 F. Supp. 2d 789, 793-94 (S.D. Ohio 1998); *see also Lockett v. Marsh USA, Inc.*, 354 F. App'x 984, 997 (6th Cir. 2009) (finding a report filed by an employee did not constitute protected activity, when it "did not take an overt stand against suspected illegal discriminatory action; it did not even mention the term discrimination; it did not suggest the need for an investigation into discriminatory practices, and there is no evidence that [recipients of the report] understood [it] to be charging discrimination.").

Here, none of Plaintiff's complaints to higher authorities at Defendant corporation constituted protected activities pursuant to Title VII. The record shows Plaintiff complained primarily to two individuals: Surindar Kumar and Brijash Malhotra. Plaintiff's complaint to Mr. Kumar concerned his opinion the plant was being maintained in a worse manner than in previous years (Court File No. 22-1, p. 33). Plaintiff's complaints to Mr. Malhotra were primarily about plant maintenance, although he also addressed Mr. Spraker's use of curse words following their

20

disagreement about water pump strainers (Court File No. 22-2, p. 10). Absent from these complaints is anything concerning race or national origin discrimination. The complaints "did not take an overt stand against discrimination, did not mention the term discrimination, and there is no evidence recipients of the complaints understood them to be charging discrimination." *See Lockett*, 354 F. App'x at 997. Plaintiff concedes as much in his deposition, stating he never told any of his supervisors he believed he was being discriminated against because of his race or national origin (Court File No. 18-4, pp. 17-18). Notably, Mr. Malhotra, himself Indian, was one of the individuals

Because Plaintiff's complaints did not concern "discrimination made unlawful by Title VII," *Barrett*, 556 F.3d at 520, they do not qualify as protected activity for purposes of Title VII retaliation. Hence, even if Plaintiff was terminated in retaliation for his complaints, such retaliation would not be actionable under Title VII or the THRA. Accordingly, Defendant is entitled to summary judgment on Plaintiff's retaliation claims.

## IV.    CONCLUSION

The Court concludes there is no genuine issue as to any material fact in Plaintiff's discrimination, harassment, and retaliatory discharge claims. Accordingly, the Court will **GRANT** Defendant's motion for summary judgment (Court File No. 18).

An Order shall enter.

**/s/**
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**

21